IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TRACY GRANT,                          :     CIVIL ACTION
                                      :     NO. 10-2204
        Plaintiff,                    :
                                      :
            v.                        :
                                      :
TIFFANY WINIK, et al.,                :
                                      :
        Defendants.                   :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                              JUNE 11, 2013

I.    INTRODUCTION............................................ 2
II.   FACTS................................................... 4
III.  APPLICABLE LEGAL STANDARDS ............................ 15
  A.   Summary Judgment Standard ............................ 15
  B.   Determining Genuine Disputes of Material Fact ........ 16
  C.   Plaintiff's Alleged Genuine Disputes of Material Fact .. 20
    1.   Contested Facts as to Baier ........................ 21
    2.   Contested Facts as to Baran and Winik .............. 24
IV.   SECTION 1983 CLAIMS AGAINST WINIK, BARAN, AND BAIER...... 30
  A.   Plaintiff's Unlawful Search and Excessive Force Claims . 32
    1.   Warrantless Entry of Pagano's Apartment ............ 38
    2.   Baran's Use of Pepper Spray ........................ 45
    3.   Winik's Use of Deadly Force ........................ 49
  B.   Remaining Eighth and Fourteenth Amendment Claims ....... 53
    1.   Denial of Medical Care Claim ....................... 53
    2.   State Created Danger and Generalized Substantive Due
         Process Claims ..................................... 54
V.    MONELL AND FAILURE-TO-TRAIN CLAIMS...................... 64
VI.   CONCLUSION............................................. 69

## I.    INTRODUCTION

In the early afternoon of February 25, 2009, Randall Pagano, a twenty-seven year old male on probation for domestic violence was fatally shot inside his apartment by Bristol Township Police Officer Tiffany Winik.  Winik, along with Officer John Baran, had responded to a call for assistance from Bucks County Probation Officer Michael Baier.  Baier had concluded that Pagano was inside his apartment and possibly experiencing medical difficulties, requiring a well-being check.

Upon arriving at the scene, Winik, Baran, and Baier executed a warrantless entry into Pagano's apartment, where they ultimately confronted Pagano in a narrow hallway.  Whether the officers were justified in entering Pagano's home without a warrant, and what happened inside the apartment that lead to the police officers' use of pepper spray and deadly force on Pagano are the issues in this case.  Ultimately, the Court must determine whether, under these circumstances, the officers' claim to qualified immunity is justified.

Plaintiff Tracy Grant, as Administratrix of the Estate of Randall Pagano, brings this action against Police Officer Defendants Tiffany Winik, John Baran, and Todd Evans,[1] the Township of Bristol, the Bristol Township Police Department, and

---

[1]     By agreement of the parties during a hearing, held on April 17, 2013, all claims against Evans are dismissed.

Police Chief James McAndrews (collectively, "Officer

Defendants"), and Bucks County Probation Officer Michael Baier,

in his official and individual capacity (Officer Defendants and

Baier, collectively, "Defendants").[2]  Plaintiff's Complaint

consists of seven counts: Counts I and II allege various

violations of Pagano's civil rights, pursuant to 42 U.S.C.

§ 1983, against Winik, Baran, Evans, and Baier; Counts III and

IV allege Monell claims against the Township of Bristol and

McAndrews; and Counts V to VII allege Pennsylvania wrongful

death, survival, and assault and battery claims against Winik,

Baran, Evans, McAndrews, and Baier.  Pl.'s Compl., ECF No. 1.

On May 11, 2012, Baier filed a Motion for Summary

Judgment.  Def. Baier's Mot. for Summ. J., ECF No. 99.

Plaintiff filed a response thereto.  Pl.'s Resp. to Def. Baier's

Mot. for Summ. J., ECF No. 106.  On May 14, 2012, Officer

Defendants collectively filed a Motion for Summary Judgment.

Officer Defs.' Mot. for Summ. J., ECF No. 101.  Plaintiff filed

a response thereto.  Pl.'s Resp. to Officer Defs.' Mot. for

Summ. J., ECF No. 108.  Officer Defendants filed a Motion for

---

[2]      Initially, Plaintiff's Complaint included various
"John Doe" and "Jane Doe" officers as defendants.  By order of
the Court, dated February 1, 2011 (ECF No. 30), Baran and Evans
were substituted for these "Doe" defendants.

Leave to File a Reply.  Officer Defs.' Reply, ECF No. 110.[3]

Baier recently filed a Motion for Leave to File a Reply.  Def.

Baier's Reply, ECF No. 113.  Defendants' motions are now ripe

for disposition.  For the reasons that follow, the Court will

grant Defendants' motions as to Counts I to IV.  And, having

dismissed all federal claims, the Court will decline to exercise

supplemental jurisdiction over the remaining state-law claims,

in Counts V to VII.

## II.  FACTS

Baier was the probation officer assigned to supervise

Pagano.  Pagano was on probation for a domestic violence

incident.  According to the parties, Baier's previous

interactions with Pagano, albeit brief, were cordial.  Hr'g Tr.

36:4-12; 48:4-22, Apr. 17, 2013, ECF No. 115.[4]

According to Baier, on February 25, 2009, at

approximately 1:19 p.m., Baier went to Pagano's apartment,

located at the Mills Crossing Apartments, for a prescheduled

probation contact meeting.  Officer Defs.' Mem. in Support of

---

[3]      The Court has reviewed the Officer Defendants' and
Baier's replies and will grant their motions.

[4]      Notably, Plaintiff does not suggest that Baier—or any
of the officers—had ill—will toward Pagano.  Indeed, prior to
the date in question, Baier had only just begun supervising
Pagano, and there is no evidence that any of the other officers
had ever met Pagano.  Hr'g Tr. 48:4-22.

Mot. for Summ. J. ("Officer Defs.' Mem.") Ex. F, Baier Dep. 26:17-28:21. Whether February 25, 2009, was the prescheduled appointment date is a contested issue of fact.

Upon arrival, Baier used his cell phone to call Pagano's home number. According to Baier, as he finished leaving a voicemail Pagano answered, terminating the answering machine recording, and said, "This is Randall. I'm having very serious problems up here." Id. at 34:19-21.[5] Whether Baier spoke with Pagano, and whether Pagano said "This is Randall. I'm having very serious problems up here," are contested issues of fact.

Thereafter, Baier attempted to contact Pagano in person by knocking on Pagano's apartment door and ringing the doorbell. Id. at 50:9-19. Upon receiving no response, Baier contacted police radio and requested assistance for a well-being check. Id. at 48:12-23.

Winik was the first to respond to the radio call, which notified her that a probation officer needed assistance

---

[5]     Evidence of record includes the following voicemail recording that Baier left for Pagano: "Mr. Pagano, it is Michael Baier, your parole officer. I'm sitting out front of your apartment. It is 1:15. I'll try to find my way in here until 1:30. Otherwise, you're gonna need to contact me and set up, because this is considered a missed appointment." Pl.'s Mem. in Opp'n to Officer Defs.' Mot. for Summ. J. ("Pl.'s Resp. Mem.—Officer Defs.") Ex. 3, ECF No. 109. Pagano's alleged response was not recorded.

checking on a parolee.  Officer Defs.' Mem. Ex. B, Winik Dep. 32:1-35:21.[6]  Winik estimated that she arrived on the scene at approximately 1:41 p.m.  Id.[7]

According to Winik, upon arrival Baier told her that he had spoken to Pagano, and that "he had reason to believe [Pagano] was in the apartment and having some kind of medical emergency.  He said [Pagano] was—sounded like he was slurring his words and then he said, 'I'm having a real problem here. I'm having a problem here.'"  Id. at 38:1-7.  As the officer dispatched to the scene and the first to arrive, Winik assumed control of the scene.  Id. at 54:8-20.

Shortly thereafter, Baran arrived on the scene. Officer Defs.' Mem. Ex. G, Baran Dep. 14:4-14.  According to Baran, aside from the initial radio request, the only other information he had was relayed to him by Winik, regarding "a potential medical emergency."  Id. at 17:13-24, 26:1-8.

---

[6]     In her deposition, Winik stated that she did not know Baier prior to the incident in question.  Id. at 35:6-16.  The Court notes that Plaintiff has not proffered evidence suggesting that any of the responding officers knew Baier prior to responding to the incident.

[7]     The radio log shows that Winik arrived within approximately six minutes of responding to the call for assistance.  Officer Defs.' Reply Ex. N, Radio Log 1 (listing Baier's arrival on scene at 13:21 (1:21 p.m.); Baier's call for police assistance at 13:32 (1:32 p.m.); Winik's response at 13:35 (1:35 p.m.); and Winik's arrival on scene at 13:41 (1:41 p.m.)).

The officers proceeded to Pagano's apartment, and
Winik knocked on Pagano's door, calling out "Randall, Randall."
Winik Dep. 51:6-16; accord Baier Dep. 53:24-54:2 (stating that
police knocked and said, "Randall, this is [the] police, are you
ok?").

Upon receiving no response, Baran contacted Bucks
County Radio and requested assistance from the apartment complex
maintenance staff. Officer Defs.' Mem. Ex. I, Recording of
Bucks County Radio Transmissions; Baran Dep. 26:10-14. But
shortly thereafter, a maintenance person, Carl Newton, happened
to pass the scene and, upon the officers' request for
assistance, unlocked Pagano's apartment door. Baran Dep. 26:14-
24.

Winik and Baran attempted to enter, but were only able
to force Pagano's apartment door open a few inches. Baran Dep.
28:4-9. Winik squeezed through the partially-opened door,
withdrew her service weapon, quickly scanned the living room,
and then cleared the sofa and chairs that were blocking the
apartment door so that Baran and Baier could enter the
apartment. Winik Dep. 68:5-71:10. As Baran entered, he too
withdrew his service weapon. Baran Dep. 31:8-9.

Winik noted that Pagano's apartment was in disarray.
Winik Dep. 72:8-73:12. Photographs of Pagano's kitchen on the
day in question also show several syringes scattered on the

7

tabletop.  Officer Defs.' Mem. Ex. K, Photographs; see also

Officer Defs.' Reply Ex. P, Photographs (Exhibits K and P,

collectively, "Photographs").

During their initial search, the officers did not find

Pagano.  While Winik checked the living room and kitchen area,

Baran checked the bathroom and behind the shower curtain.  Winik

Dep. 72:2-73:5.  According to Baran, he called out Pagano's name

as he proceeded down the hallway and into Pagano's bedroom.

Baran Dep. 34:2-22.

As the search continued, Baran discovered Pagano in

his bedroom closet, and the officers approached with service

weapons drawn.  Winik Dep. 77:10-82:20.[8]  According to the

officers, they announced their presence and instructed Pagano to

show his hands, but Pagano failed to comply.  Id. at 91:3-22.

At this point, Baier knocked on the wall and said "Mr. Pagano,

probation officer, Michael Baier.  At this point you will be

under arrest."  Pl.'s Mem. in Opp'n to Def. Baier's Mot. for

---

[8]      Plaintiff characterizes the officers' entry into
Pagano's apartment as follows: they "raided" Pagano's apartment
as he was sitting passively in his bedroom closet, dressed only
in his boxer shorts.  Pl.'s Resp. Mem.—Officer Defs. 4, 17.  The
officers did ultimately discover Pagano in his bedroom closet
dressed only in his boxer shorts.  In her deposition, Winik
states that she could not see Pagano the entire time he was
sitting in the closet.  Winik Dep. 85:17-18.  In his deposition,
Baran states that he could see only Pagano's bare chest but not
his face or the rest of his body because he was sitting behind a
large Rubbermaid tote.  Baran Dep. 37:22-38:20.

Summ. J. ("Pl.'s Resp. Mem.—Def. Baier") Ex. 2, Baier Dep. 136:17-137:2.

According to Baran, he wanted to check on Pagano's well-being, and ordered him to come out of the closet. Baran Dep. 40:14-46:24. Believing that he was hiding in the closet, Baran stated that he wanted to approach Pagano, but because he could not see Pagano's hands he determined that it was unsafe to do so. Id. at 47:8- 48; see also Officer Defs.' Reply Ex. O, Report of John J. Ryan ("Ryan Report") 20-21. According to Baran, Pagano did not respond to show-hands commands. Baran Dep. 46:18-51:16. Baran then deployed his pepper spray into the closet, in Pagano's direction. Id. at 47:6-9. Pagano did not respond to the pepper spray. Id. at 47:6-49:2. At that point, Baran still could not see Pagano's hands, and again ordered Pagano to show his hands. Id. Baran then concluded that the first spray was blocked by clothing hanging in the closet, and deployed his spray a second time, this time hitting Pagano on the chest. Id. at 49:12-22. Whether Baran ordered Pagano to show his hands prior to deploying the pepper spray is a contested issue of fact. Pl.'s Resp. Mem.—Officer Defs. 23.

According to Baran, after removing the tote from the closet, he was able to observe both of Pagano's hands, at which point he and Winik holstered their service weapons and prepared to enter the closet to remove Pagano. Baran Dep. 59:1-20.

Before the officers could do so, Pagano broke an empty aquarium tank in the closet and grabbed a large shard of glass.[9] Id. at 62:17-22. Baran alerted Winik of what Pagano had done and also alerted Bucks County Radio dispatch that they needed back-up. Recording of Bucks County Radio Transmissions 4:28-4:52. According to the police officers, they then withdrew their service weapons and retreated into the hallway. Winik Dep. 113:18-126:22.

Now in the hallway and with their weapons raised, Baran and Winik ordered Pagano several times to stop and drop the piece of glass. Id. at 128:24-129:1; Baran Dep. 72:24-73:2; Baier Dep. 85:4-10. According to the officers, Pagano failed to comply and continued towards the officers, at which point Winik ordered Pagano, "Stop, or we'll shoot." Winik Dep. 164:10-16.

Winik estimated that as Pagano crossed the threshold of the bedroom and into the hallway—which is approximately eleven feet long—she discharged her service weapon once, striking Pagano in the mid to lower right side. Id. at 129:16-136:4. Plaintiff disputes this distance. Pl.'s Resp. Mem-Officer Defs. 23. Winik and Baran stated that Pagano then stopped and dropped the glass, spun backwards and fell back onto

---

[9]     According to Baier, at this point the officers directed him to a wall behind Winik as he was unarmed and without a protective vest. Def. Baier's Mem. in Support of Mot. for Summ. J. ("Def. Baier Mem.") 7, ECF No. 100.

the bedroom floor, where he lay unmoving.  Id.; Officer Defs.'
Mem. Ex. K, Scene Diagram.  Immediately thereafter, Baran
notified Bucks County radio dispatch that shots had been fired,
and requested an ambulance.  Recording of Bucks County Radio
Transmissions 6:25, 7:07-7:12.

Meanwhile, Evans had responded to Baran's earlier
radio call for assistance, and was the third police officer to
arrive on the scene to assist.  Officer Defs.' Mem. Ex. L, Evans
Dep. 5:21-6:4.  According to Evans, as he proceeded up the
stairs to Pagano's apartment, he heard a single gunshot.  Id. at
6:8-18.  As he entered the apartment, Evans heard Baran giving
commands for Pagano to show his hands while Pagano was on the
ground.  Id. at 6:21-7:4.  While Baran kept his service weapon
pointed at Pagano, Evans handcuffed Pagano's hands behind his
back.  Id. at 11:20-22; Officer Defs.' Mem. Ex. D, McAndrews
Dep. 66:6-22 (explaining that handcuffs were used to secure
Pagano and secure scene for emergency medical personnel).  Upon
turning Pagano over, Baran and Evans realized that he was
bleeding, so they removed the handcuffs and Baran applied
pressure to Pagano's wounds until emergency personnel arrived,
approximately three minutes and forty-three seconds after
Baran's request.  Baran Dep. 81:2—82:17; Recording of Bucks
County Radio Transmissions 10:08.  Pagano was taken to the
hospital, where he later died.

On the date in question, there were in effect several relevant procedures and training scenarios instituted by the Bristol Township Police Department.[10]  First, the Department had instituted protocol regarding the use of pepper spray, permitting its use where officers are confronted with "resistant individuals," or "when it is unsafe for an officer to approach a

---

[10]      The parties both proffered expert reports regarding Bristol Township Police Department policies and training and the police officers' application thereof.  Plaintiff proffers a report by Dr. R. Paul McCauley.  Pl.'s Resp. Mem.—Officer Defs. Ex. 9., McCauley Report.  Officer Defendants proffer a report by John J. Ryan.  Ryan Report.  Neither party has challenged the qualifications of the opposing party's expert.

The Court has reviewed the proffered reports.  The Court finds that, by virtue of his education and experience, Dr. McCauley is qualified to render an opinion regarding police administration, operations, and policies based on facts and data of record in this case.  His opinion is reliably based upon Bristol Township Police Department policies, as well as best practices of police and law enforcement management and operations, and fits the facts of the case.  See Fed. R. Evid. 702; In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 751 (3d Cir. 1994) (holding that, under Rule 702, a witness may qualify as an expert if three requirements are satisfied: (1) the witness must have "sufficient knowledge, skills, and training in the relevant field"; (2) the testimony must be the product of reliable principles and methods; and (3) the testimony must fit the facts of the case so that it assists the trier of fact).

Likewise, the Court finds that Mr. Ryan, by virtue of his education and experience, is qualified to render an opinion regarding law enforcement practices based on facts and data of record in this case.  His opinion is reliably based upon Bristol Township Police Department policies, as well as best practices of police and law enforcement management and operations, and fits the facts of the case.  See Fed. R. Evid. 702; In re Paoli R.R. Yard PCB Litig., 35 F.3d at 751.  Accordingly, the Court will reference the expert opinions of Dr. McCauley and Mr. Ryan as applicable.

suspect within contact range." Pl.'s Resp. Mem.—Def. Baier Ex.
14, Bristol Township General Order B-09, Use of Less-Than-Lethal
Force, Oleoresin Capsicum (OC) Spray and OC Pepperball System
("General Order B-09"). This protocol authorizes the use of
pepper spray after exhausting reasonable means and instructs
that, whenever practical and reasonable, an officer should first
issue a verbal warning prior to using pepper spray against a
suspect. General Order B-09.

Second, the Department had protocol regarding dealing
with a barricaded person. Pl.'s Resp. Mem.—Def. Baier Ex. 13,
Bristol Township General Order E-02, Barricaded Persons and
Hostage Situations ("General Order E-02"). The parties agree
that this protocol leaves undefined the phrase "barricaded
individual." Pl.'s Resp. Mem.—Officer Defs. 66; Officer Defs.
Reply 14. Baran and Winik both received a copy of the
department's barricaded person policy, but never received
individualized training on the matter. Pl.'s Resp. Mem.—Officer
Defs. 70-78.

According to McAndrews' deposition testimony, he
relies on his officers' discretion in determining whether a
situation involves a barricaded individual. Relevant here,
Winik and Baran did not follow the protocol under General Order
E-02, stating that they did not believe Pagano was a barricaded

individual.  Officer Defs.' Mem. 17 (citing depositions of
Winik, Baran, and McAndrews).

And third, Winik described tactical training she
received regarding a suspect armed with an edged weapon, wherein
she was taught that the suspect could close a distance of
twenty-one feet before the officer could draw a weapon (the
"Twenty-One Foot Rule").  Winik Dep. 168:7-169:18.  Relevant
here, Winik estimated that the hallway in Pagano's apartment was
approximately twelve to fifteen feet long.  Id.; Scene Diagram
(documenting length of hallway as eleven feet); see also
Photographs.  Winik also described herself on the date in
question as five feet and four inches tall and weighing
approximately one hundred and five pounds, and estimated that
Pagano was over six feet tall.  Winik Dep. 180:12-181:4.

Prior to the date in question, Baier was the probation
officer assigned to supervise Pagano.  In that capacity, Baier
had only met with Pagano on one previous occasion, for an
initial contact meeting.  During that meeting, Pagano completed
a Parole Department Client Information Sheet.  Def. Baier Mem.
Ex. 2, Parole Department Client Information Sheet ("Client
Information Sheet").  In this Client Information Sheet, Pagano
indicated no current drug use, but did indicate a prior drug
history, as well as current medications, which included, among
others, Suboxene, for a heroin addiction, and Lexapro.  Id.

Additionally, Baier acknowledges that, during the meeting, Pagano mentioned having received prior medical treatment and rehabilitation for heroin use in 2006.  Def. Baier Mem. 63.  However, Baier states that, because this meeting was cut short, he had an incomplete social history and was unaware that Pagano had ongoing drug issues from 2007 to 2009, or that Pagano had suicidal tendencies.  Id. at 4-6.  Baier states that he was aware of the charges leading to Pagano's sentence of four consecutive ninety day probation periods, which resulted from a negotiated guilty plea for a domestic violence-related incident. Id. at 4.  The extent to which Baier knew of Pagano's ongoing drug and mental health issues is a contested issue of fact. Pl.'s Resp. Mem.—Def. Baier 48.

## III. APPLICABLE LEGAL STANDARDS

### A. Summary Judgment Standard

Summary judgment is appropriate if there are no genuine disputes as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact."  Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "The judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

B. Determining Genuine Disputes of Material Fact

In accordance with the appropriate standard of review, the Court views the contested facts in the light most favorable

to Plaintiff, as the non-moving party.  The Court notes

preliminarily that Officer Defendants have provided a detailed

recitation of the facts, based largely upon the depositions and

radio transmissions of Winik, Baran, Evans, and Baier, each of

whom were present during the incident in question.  Given that

Pagano is deceased, he is obviously not personally available to

contradict Defendants' account.  However, Plaintiff has had the

opportunity to depose Defendants, and in certain instances has

proffered a conflicting account.  Where relevant and material,

the Court will address these conflicts.

Motions for summary judgment in cases involving

qualified immunity raise unique challenges.  Specifically,

courts are confronted with the often thorny task of ascertaining

what, if any, contested facts undercut an officer's entitlement

to qualified immunity, and whether those facts are material,

rendering summary judgment inappropriate.  This task becomes

even more difficult in excessive force cases, which often turn

on the "reasonableness" of an officer's actions—a determination

the Third Circuit has recognized "is normally an issue for the

jury."  Rivas v. City of Passiac, 365 F.3d 181, 198 (3d Cir.

2004).  And, as here, where the person subjected to the alleged

constitutional violations is deceased, courts are faced with a

narrative based, in large part, on statements from the surviving

witnesses, usually the defendants, themselves.

Regardless of this difficulty, the Supreme Court has encouraged disposition of a case involving qualified immunity at the earliest stage possible.  This is so because qualified immunity is not merely a defense to liability; rather, the doctrine results in immunity from suit, "effectively lost if a case is erroneously permitted to go to trial."  Scott v. Harris, 550 U.S. 372, 376 n.2 (2007).

Illustrative is Scott v. Harris,[11] where the Supreme Court reviewed the district court's denial of summary judgment in an excessive force case involving qualified immunity.  The Harris Court reiterated:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .

Id. at 380 (internal citations omitted).

---

[11]     The Court notes that Scott is distinguishable in that the record before the Scott Court included objective video tape evidence depicting the respondent's reckless driving, the facts of which the respondent contested at the summary judgment phase. 550 U.S. at 376 (reversing district and appellate courts' denial of summary judgment in excessive force case based on "material issues of fact on which the issue of qualified immunity turns which present sufficient disagreement to require submission to a jury," after finding that the non-moving party's differing story "blatantly contradicted by the record, so that no reasonable jury could believe it").  Nevertheless, the Supreme Court did not limit its reasoning and holding to the facts present in Scott.

Moreover, in cases involving deadly force, the search for genuine disputes of material fact becomes even more complicated, especially where non-police officer witnesses are unavailable to provide the decedent's version. Indeed, the Third Circuit has recognized this challenge:

> Because the victim of deadly force is unable to testify, we have recognized that a court ruling on summary judgment in a deadly-force case should be cautious . . . to ensure that the officers are not taking advantage of the fact that the witness most likely to contradict their story—the person shot dead— is unable to testify. Thus, a court should avoid simply accepting what may be a selfserving account by the officers. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officers' story, and consider whether this evidence could convince a rational fact finder that the officers acted unreasonably.
>
> This is not to say that the summary judgment standard should be applied with extra rigor in deadly-force cases. Rule 56 contains no separate provision governing summary judgment in such cases. Just as in a run-of-the-mill civil action, the party opposing summary judgment in a deadly-force case must point to evidence—whether direct or circumstantial—that creates a genuine issue of material fact, and may not rely simply on the assertion that a reasonable jury could discredit the opponent's account.

Lamont v. New Jersey, 637 F.3d 177, 181-82 (3d Cir. 2011) (internal quotation marks, editorial marks, and citations omitted).

Accordingly, to satisfy the mandate from the Supreme Court and the Third Circuit, Plaintiff may not rely on a general challenge to the credibility of the officers' account. Instead,

Plaintiff must point to contradictions in the testimony of eye witnesses, or between or among the various officers on the scene, or incompatibility of the testimony of the witnesses with the physical or forensic evidence at the scene, or any other direct or circumstantial evidence that raises a genuine dispute of material fact or casts doubt on the veracity of the officers' testimony. Therefore, as to each contested fact to which Plaintiff points, the Court will examine whether the contested fact is material and whether it is genuinely disputed.

C. Plaintiff's Alleged Genuine Disputes of Material Fact

The Court notes the following facts, each of which Plaintiff argues are both material and in genuine dispute and as to which Plaintiff points to allegedly contradictory evidence of record supporting her claims. Regarding Baier's motion for summary judgment, Plaintiff disputes the following: (1) whether February 25, 2009, was indeed the pre-scheduled date of the probation appointment, or whether Baier appeared unannounced; (2) whether Pagano said to Baier, "This is Randall. I'm having very serious problems up here"; and (3) Baier's subjective awareness of Pagano's drug and mental health history, prior to the incident in question. Regarding Officer Defendants' motion for summary judgment, Plaintiff disputes the following: (1) whether Baran issued verbal warnings to Pagano prior to

deploying pepper spray; and (2) precisely where Pagano was and whether he was advancing toward the officers when Winik fired. For the reasons stated below, none of these contested issues presents a genuine dispute of material fact requiring resolution at trial.

### 1. Contested Facts as to Baier

As to Baier, Plaintiff first disputes whether February 25, 2009, was in fact the correct pre-scheduled appointment date. Plaintiff points to a business card showing an appointment date of February 26, 2009. Pl.'s Resp. Mem.—Def. Baier 2 (citing Ex. 4, Business/Appointment Card from Probation Officer Baier). During oral argument, counsel for Plaintiff referenced Baier's calendar, which was produced during discovery. The calendar appeared to have certain entries erased and/or modified and on which "Date with Pagano" appeared listed for February 25, 2009. Hr'g Tr. 43:10-23. In his deposition, Baier maintained that the appointment, rescheduled from an earlier date, was for February 25, 2009. Def. Baier's Mem. 5. Although initially arguing that Baier was acting with a bad motive,[12] at oral argument, Plaintiff's counsel conceded that

---

[12]     If Baier had been acting with ill will or malice, then the discussion of the date might be relevant to the contention that Baier just wanted to enter Pagano's apartment and that he appeared unannounced.

there was no evidence of ill will or malice on the part of
Baier.  Hr'g Tr. 36:4-12; 48:4-22.  Other than the apparent
conflict as to the exact day of the appointment, Plaintiff
points to no evidence suggesting that Baier did not genuinely
believe that February 25, 2009, was in fact the correct date
when he appeared at Pagano's apartment.  At most, the evidence
of record—namely, the business card listing the appointment as
February 26, 2009, and Baier's calendar and deposition testimony
that the appointment was for February 25, 2009—shows that Pagano
and Baier each believed that the appointment was on a different
date.  As discussed below, Baier's liability ultimately turns
upon the reasonableness—and not the correctness—of his actions;
accordingly, this contested fact is not material.

Second, Plaintiff challenges whether Baier ever
actually spoke with Pagano that day, and whether Pagano said to
Baier, "This is Randall.  I'm having very serious problems up
here."[13]  In disputing Baier's deposition testimony, Plaintiff
points to an email by Warren Grant, Baier's supervisor, in which
Grant summarizes a conversation with Baier that took place
approximately two and a half hours post-incident, during which
Baier allegedly told Grant that "He (Pagano) was not doing well

_____

[13]      In addition to Baier's deposition testimony, evidence
of record includes Baier's voicemail, which—according to Baier—
he had just finished leaving on Pagano's home answering machine
when Pagano picked up the phone.  See supra p. 5.

and could not meet with Mike (Baier)."  Pl.'s Resp. Mem.—Def.
Baier 18.  Plaintiff argues that two years later, during his
deposition, Baier described a more alarming situation; namely,
that Pagano allegedly stated, "This is Randall.  I'm having a
very serious problem up here."  Id. at 18-19 (citing Baier Dep.
34:19-21).  Plaintiff concludes that the "whole case runs on
that statement. . . . [W]ithout [it,] there is no reason to go
into the apartment."  Hr'g Tr. 58:1-4.

The best that can be said of Plaintiff's argument is
that there is an inconsistency between Baier's initial
recollection of this conversation, as memorialized in Warren
Grant's email, and Baier's later deposition testimony concerning
the relative gravity of the situation Baier encountered.  Be
that as it may, the Court must ultimately judge Baier's conduct
based on a reasonable probation officer under the circumstances.
Because, as discussed below, even accepting Plaintiff's version—
that Grant's email, taken closer to the incident, is more
accurate than Baier's later recollection during his deposition—
under the circumstances, Baier would have been justified in
making an on-the-spot decision to seek police assistance.
Therefore, this contested fact is not material.

And third, notwithstanding Baier's representation that
he only discovered the nature and extent of Pagano's drug abuse

and mental health issues during discovery in this case,[14]

Plaintiff concludes that Baier "was, nevertheless, aware of

Pagano's drug problems, medical history, and social history."

Pl.'s Resp. Mem.—Def. Baier 48.  Based on the evidence of

record—namely, Pagano's Client Information Sheet—Pagano

indicated no current drug use.  Pagano did disclose a prior drug

history, as well as current medications including, among others,

Suboxene, for a heroin addiction, and Lexapro.  Plaintiff points

to no evidence of record suggesting that Baier was either

subjectively—or that objectively, he should have been—aware of

the extent or ongoing nature of Pagano's drug and mental health

issues, or how those conditions, although ultimately present,

would have affected the situation Baier confronted at the

doorsteps of Pagano's apartment.  Accordingly, Plaintiff fails

to demonstrate a genuine dispute as to this fact.

> 2. <u>Contested Facts as to Baran and Winik</u>

As to Baran and Winik, Plaintiff first disputes

whether Baran ever ordered Pagano to show his hands prior to

deploying the pepper spray either the first or second time.

Pl.'s Resp. Mem.—Officer Defs. 23.  The only evidence of record

on this issue includes the depositions of Baran, Winik, and

---

[14]        Indeed, in his motion, Baier argues that, aside from
what Pagano relayed, none of this information would have been
available without a HIPAA release.  Def. Baier Mem. 5.

Baier.  Each deposition supports Baran's account that he did so

prior to deploying the spray.  Officer Defs.' Mem. 11 (citing

depositions of Winik, Baran, and Baier).  Aside from mere

conjecture, Plaintiff has not pointed to any evidence of record—

whether it be deposition testimony or forensic evidence—to

contradict the officers' account.[15]  Accordingly, Plaintiff fails

to demonstrate a genuine dispute as to this fact.

And second, Plaintiff disputes precisely where Pagano

was and whether he was advancing toward the officers when Winik

fired her weapon.[16]  Pl.'s Resp. Mem.—Officer Defs. 16 (stating

that "there is an indication that Pagano was still in the

bedroom, and not coming towards Winik").  Photographs of the

---

[15]      In support, Plaintiff points to Baier's deposition, in
which he noted that the pepper spray was so prevalent that Baran
and Winik were coughing, and that he had to open the windows in
the bedroom.  Pl.'s Resp. Mem.—Officer Defs. 15 (citing Baier
Dep. 78:2-12).  The Court notes that this evidence does not
contradict Baran's account; indeed, that the first spray failed
to reach Pagano and instead settled around the officers is
consistent with Baran's claim that when he first aimed the
pepper spray in Pagano's direction, Pagano was protected by the
clothing hanging in the closet.

[16]      The Court notes that, although Plaintiff challenges
Pagano's physical location when shot, she does not challenge
where Pagano sustained the gunshot wound, which evidence of
record shows was in the mid to lower right side.  Winik Dep.
135:24-136:4 (describing wound site as Pagano's "right side" and
"center to the right"); Baran Dep. 77:1-4, 79:17-22 (describing
wound site as Pagano's "mid to lower right side" and noting that
officers rolled him over onto his back before seeing wound and
administering emergency aid).  If the record indicated that
Pagano had been shot in the back, then that would be another
matter.  But that is not this case.

scene and the Scene Diagram show a large shard of glass located near the bedroom door. Officer Defs.' Mem. Ex. J, Photographs of Glass; Scene Diagram (showing photographs of shard of glass and marking location recovered as "A" on Scene Diagram). The Scene Diagram lists the distance of the hallway as eleven feet. Scene Diagram. The Scene Diagram also shows a large blood stain near Pagano's bed, marked as "K." Id.

## Photographs of Glass





## Scene Diagram



The forensic evidence to which Plaintiff cites is consistent with the officers' account of the shooting; namely, that Pagano, armed with a shard of glass, moved from the closet towards the doorway, where he was shot in the mid to lower right side. Pagano then took a few steps backwards, ultimately landing in an area by his bed. See Officer Defs.' Mem. 14 (citing depositions of Winik, Baran, and Baier, each offering consistent recollection of precipitating events); see also Photographs; Scene Diagram; Photographs of Glass. Thus, Plaintiff fails to demonstrate a genuine dispute as to this fact.

Having examined all the disputed facts, the Court concludes that none raises a genuine issue of material fact in this case. Thus, the Court will now address whether Defendants are entitled to qualified immunity on this record.

## IV.  SECTION 1983 CLAIMS AGAINST WINIK, BARAN, AND BAIER

Plaintiff asserts several claims based on 42 U.S.C. § 1983. To state a viable claim for relief under § 1983,[17] the

---

[17]        Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall

plaintiff must prove "that the defendant has deprived him of a

right secured by the 'Constitution and laws' of the United

States . . . and that the defendant deprived him of this

Constitutional right 'under the color of any statute, ordinance,

regulation, custom or usage of any State or Territory.'"

Dykes v. Se. Pa. Transp. Auth., 68 F.3d 1564, 1566 (3d Cir.

1995) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 150

(1970)).[18] "[T]o prevail on a § 1983 claim against multiple

defendants, a plaintiff must show that each individual defendant

---

be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (2012).

[18] Here, it appears undisputed that Winik, Baran, and Baier were acting pursuant to authority from the state in the performance of their official duties, and therefore were acting under the color of law. See Barna v. City of Perth Amboy, 42 F.3d 809, 820-21 (3d Cir. 1994) ("[A]cts of a state or local employee in her official capacity will generally be found to have occurred under color of state law." (internal citations omitted)); see also Griffin v. Maryland, 378 U.S. 130, 135 (1964) ("If an individual is possessed of state authority and purports to act under that authority, his action is state action."); Screws v. United States, 325 U.S. 91, 111 (1945) ("Acts of [police] officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it.").

To the extent that Plaintiff proceeds against the individual officers in their official capacity, those claims are addressed below. See Gregory v. Chehi, 843 F.2d 111, 120 (3d Cir. 1988) (citing Monell, 436 U.S. at 690 n.55) (holding that suits against defendant officials in their official capacity are "only a duplication of the counts asserted against the Township [defendant] itself").

violated his constitutional rights."  Estate of Smith v.
Marasco, 430 F.3d 140, 151 (3d Cir. 2005).

First, the Court will address Defendants' motions for
summary judgment as to Plaintiff's unlawful search and excessive
force claims.  And second, the Court will address Defendants'
motions as to Plaintiff's remaining Eighth and Fourteenth
Amendment claims.

## A. Plaintiff's Unlawful Search and Excessive Force Claims

Plaintiff advances the following violations of
Pagano's Fourth Amendment rights:  (1) Winik, Baran, and Baier
entering Pagano's apartment without his consent and without a
warrant, constituting an unlawful search; (2) Baran's use of
pepper spray, constituting excessive force; and (3) Winik's use
of deadly force, also constituting excessive force.[19]

The Fourth Amendment protects against unreasonable
searches and seizures.  A search of a home, without a warrant,
is presumptively unreasonable; of course, the warrant
requirement is subject to certain exceptions.  Ray v. Twp. of

---

[19]        "The Supreme Court has held that all claims of
excessive force by police officers, in the context of an arrest,
investigatory stop, or other 'seizure,' should be analyzed under
the Fourth Amendment."  Rivas, 365 F.3d at 198 (citing Graham,
490 U.S. at 395 (1989)).  The parties disagree as to at what
point a "seizure" of Pagano actually took place.  Although it
would appear that, upon the officers' finding Pagano in the
closet, Pagano was not free to leave, because—as discussed
below—this issue is ultimately not dispositive, the Court need
not resolve it here.

Warren, 626 F.3d 170, 174 (3d Cir. 2010).  "'A claim for excessive force under the Fourth Amendment requires a plaintiff to show that a seizure occurred and that it was unreasonable.' A seizure occurs '[w]henever an officer restrains the freedom of a person to walk away.'"  Rivas, 365 F.3d at 198 (quoting Tennessee v. Garner, 471 U.S. 1, 7 (1985); Curley v. Klem, 298 F.3d 271, 279 (3d Cir. 2002)).

    Here, the officers do not dispute that they entered Pagano's home without his consent, and without a warrant.  Nor do they dispute that Baran used force—namely, the pepper spray— against Pagano, or that Winik used deadly force against Pagano. As to the "reasonableness" of the officers' use of force, such a determination "is normally an issue for the jury."  See Rivas, 365 F.3d at 198.  However, because qualified immunity protects government officials from suit, not just from liability, the Court must first determine whether the officers are entitled to qualified immunity.  Entitlement to qualified immunity is an issue of law for the Court to decide based on the facts of record.  See Curley v. Klem, 499 F.3d 199, 211 (3d Cir. 2007) (citation omitted); see also Bartholomew v. Pennsylvania, 221 F.3d 425, 428 (3d Cir. 2000).  If upon the facts of record, the officers are entitled to qualified immunity, then summary judgment must be granted.  See Curley, 499 F.3d at 211; Bartholomew, 221 F.3d at 428.

"The doctrine of qualified immunity insulates government officials who are performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" James v. City of Wilkes-Barre, 700 F.3d 675, 679 (3d Cir. 2012) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).[20] Specifically, qualified immunity seeks "to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." Hope v. Pelzer, 536 U.S. 730, 739, (2002).

This doctrine balances the competing interests of holding public officials accountable if and when they exercise their power irresponsibly, while protecting officials from liability when they execute their duties reasonably. Pearson v. Callahan, 555 U.S. 223, 231-32 (2009). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Id. at 231 (internal quotation marks and citation omitted). Indeed, "[t]his inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were

---

[20]     In this case, the Court will assume, for purposes of analysis, that by their actions Winik, Baran, and Baier violated Pagano's Fourth Amendment Rights.

clearly established at the time it was taken." Id. at 244
(internal quotation marks and citation omitted).

Accordingly, qualified immunity shields officers in
the ordinary exercise of their discretionary duties.  This
protection, however, is forfeited where the action complained of
is in contravention of "clearly established statutory or
constitutional rights of which a reasonable person would have
known."  Wilson v. Layne, 526 U.S. 603, 614 (1999) (quoting
Harlow, 457 U.S. at 818).

In Saucier v. Katz, the Supreme Court articulated a
general two-step test for determining whether a government
official, such as a police officer, is entitled to qualified
immunity.  533 U.S. 194 (2001), limited by Pearson, 555 U.S. at
223.  The first step of the Saucier framework asks whether the
officer's conduct violated a constitutional or federal right.
533 U.S. at 201.  As the Third Circuit has characterized it,
"[t]his is not a question of immunity, but whether there is any
wrong to address."  Ray, 626 F.3d at 174 (citation omitted).

The second step asks whether the right that was
violated was "clearly established," meaning that "it would be
clear to a reasonable officer that his conduct was unlawful in
the situation he confronted."  Saucier, 533 U.S. at 202.  "If
the officer made a reasonable mistake about the legal
constraints on his actions, then qualified immunity should

protect him from suit." Ray, 626 F.3d at 174 (internal quotation marks and citation omitted); see also Lamont, 637 F.3d at 182 (noting that under Saucier step two, right must have been clearly established in particularized sense; namely, "a reasonable official would [have understood] that what he [wa]s doing violate[d] that right" (citation omitted)).

As to the use of force, the parties agree that the Court must judge the reasonableness of an officer's conduct based on the totality of the circumstances and "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Pl.'s Resp. Mem.—Officer Defs. 10 (internal quotation marks omitted) (citing Graham v. Connor, 490 U.S. 386, 396 (1989)); see also Officer Defs.' Reply 7 (citing Graham's objective reasonableness test as appropriate Fourth Amendment standard). Indeed, reviewing courts must "keep in mind that a threat that may seem insignificant to us in the security of our chambers may appear more substantial to a reasonable officer whose own life or security is at stake." Mellott v. Heemer, 161 F.3d 117, 122 (3d Cir. 1998).

Upon revisiting the Saucier framework, the Supreme Court held that the two-step analysis need not be addressed in sequence. Pearson, 555 U.S. at 236 (noting that sequential analysis "is often beneficial," but that courts may exercise discretion where application would result in unnecessary

litigation and determination of constitutional issues, ultimately "disserv[ing] the purpose of qualified immunity" and resulting in "substantial expenditure of scarce judicial resources"). Accordingly, the purpose of qualified immunity analysis, the Court will assume, without deciding, that the warrantless entry into Pagano's apartment and the alleged use of excessive and deadly force violated Pagano's Fourth Amendment right to be free from unreasonable searches and seizures and will proceed to step two of the Saucier framework, assessing whether it would have been clear to reasonable officers that their conduct was unlawful in the situation they confronted.[21]

Here, Winik, Baran, and Baier argue that qualified immunity shields them from suit as to Plaintiff's § 1983 unlawful entry, excessive force, and deadly force claims.

---

[21] The parties disagree on whether the Fourth or Fourteenth Amendment governs the entry into Pagano's apartment, and the use of pepper spray and deadly force against Pagano. Resolving this issue would require a lengthy foray into constitutional law analysis. The Court will assume, without deciding, that the appropriate standard of review is that of the more specific constitutional provision—the Fourth Amendment. See Graham, 490 U.S. at 388; (holding that proper constitutional standard governing free citizen's claim that law enforcement officials used excessive force in making arrest, investigatory stop, or other "seizure" is Fourth Amendment's objective reasonableness standard and not substantive due process standard); see also, e.g., United States v. Lanier, 520 U.S. 259, 272, n.7 (1997) (holding that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process").

Plaintiff responds that Winik, Baran, and Baier violated department policies; thus, they acted in an objectively unreasonable manner and are not entitled to qualified immunity.

### 1. Warrantless Entry of Pagano's Apartment

The Court will first address the warrantless entry into Pagano's apartment. [22]  The Court finds that Winik, Baran, and Baier are entitled to qualified immunity on this issue.[23]

Winik, Baran, and Baier indeed entered Pagano's apartment without his consent, and without a warrant.  True enough, as Plaintiff argues, such an entry is presumptively unreasonable and violates the Fourth Amendment.  But here, Baier contacted the police to conduct a "well-being check" as part of the "community caretaking function" exception to the Fourth Amendment's warrant requirement.

Prior to the 2010 case Ray v. Township of Warren, the Third Circuit had not addressed the issue of whether this

---

[22]    In assuming a Fourth Amendment violation and proceeding to Saucier's second step, the Court need not address the point at which the officers' conduct constituted a "search" or "seizure" of Pagano.

[23]    In finding that qualified immunity applies, the Court need not analyze whether Pagano, as a probationer, also had both a reduced expectation of privacy and a legal obligation to meet with Baier.  See generally Griffin v. Wisconsin, 483 U.S. 868 (1987); see also Officer Defs.' Mem. Ex. S, Decedent's Buck's County Adult Probation and Parole Department Domestic Violence Supervision Protocol Form.

exception—originally applied in the automobile context—would also justify a warrantless entry into a home.  In Ray, the plaintiff's wife had gone to his house to pick up their youngest daughter for court-ordered visitation.  Ray, 626 F.3d at 171. Upon seeing someone moving about in the home, but receiving no response to ringing the doorbell or knocking on the door, she called the police.  Once they arrived, the wife relayed to the responding officers what had transpired and that she was concerned for her daughter's well-being—a concern which the officers shared.  Id. at 172.  The responding officers, some of whom were aware of the acrimonious divorce proceedings and child-custody dispute between the couple, also knocked on the door and called the residence, but likewise received no response.  Id.  Thereafter, and without a warrant,[24] the officers entered the residence to check on the child's well-being.  Id.

The Third Circuit ultimately held that the community caretaking function, which the Supreme Court recognized in the

_____

[24]     The Third Circuit noted that, prior to entering, the responding officers contacted a municipal court judge for guidance as to whether the officers could enter the home and look for the child without a warrant, and they received approval. Id. at 172.  Though the specifics of that conversation remained unclear, the officers testified that they only sought advice regarding entering the home out of concern for the daughter's well-being; they did not perceive the call as a request for a warrant of any kind. Id.  Though the Third Circuit did note these circumstances, the Ray decision did not condition qualified immunity on the officers having obtained and relied upon the magistrate's legal advice.  See id.

automobile context in Cady v. Dombrowski, 413 U.S. 433 (1973),

did not extend to warrantless entries into homes.  Ray, 626 F.3d

at 177.  However, the Third Circuit also held that the

responding officers were protected by qualified immunity,

reasoning:

> Until our decision in this case, the question of
> whether the community caretaking doctrine could
> justify a warrantless entry into a home was unanswered
> in our Circuit.  Given the conflicting precedents on
> this issue from other Circuits, we cannot say it would
> have been apparent to an objectively reasonable
> officer that entry into Ray's home . . . was a
> violation of the law.

Id. at 177; see also Hope, 536 U.S. at 741 (holding that officer

is entitled to qualified immunity unless, at time of alleged

constitutional violation, state of law gave officer fair warning

that his conduct was unconstitutional).

Here, the Third Circuit's holding in Ray is

dispositive.[25]  The event in question occurred on February 25,

2009, prior to the Third Circuit's 2010 holding in Ray.  Thus,

---

[25]      Plaintiff cites Burr v. Hasbrouk Heights, 131 F. App'x
799 (3d Cir. 2005), a non-precedential opinion, to suggest that
the officers should have been on notice that their conduct was
unlawful.  This argument is unavailing.  First, the opinion is
of no precedential weight.  But more importantly, the Third
Circuit in Ray afforded the officer defendants qualified
immunity notwithstanding the previous 2005 non-precedential Burr
decision.  The Court finds no reason to hold differently.

     Plaintiff also looks to United States v. Coles, 437
F.3d 361, 365 (3d Cir. 2006), arguing that—in addition to
relying on an invalid exception—the officers also lacked the
requisite probable cause.  This argument likewise fails.

Winik, Baran, and Baier are entitled to qualified immunity because, as in Ray, at the time of the warrantless search it would not have been apparent to a reasonable officer that such a search was a violation of the law.

The record supports this conclusion. Similar to the wife in Ray, here Baier arrived for what he believed to be a pre-scheduled appointment.[26] After receiving no response, but believing that Pagano was inside, Baier requested police assistance to conduct a "well-being check." By calling the police, Baier reasonably attempted to balance the scope of his authority and relationship with Pagano, as his probation officer, against the perceived exigent circumstances. Even accepting Plaintiff's version, those circumstances included arriving for what Baier believed to be a pre-scheduled home visit with Pagano, an individual on probation for domestic violence with a history of drug and mental health-related issues, who had just stated that he could not meet because "[h]e (Pagano) was not doing well and could not meet with Mike (Baier)," and thereafter was not answering the door. Under these circumstances, a reasonable probation officer in Baier's situation would have been justified in making an on-the-spot

---

[26]    Whether the appointment was actually scheduled for the following day is immaterial, as Plaintiff points to no evidence suggesting that Baier did not genuinely believe that February 25, 2009, was in fact the correct date.

decision to rely on the police's community caretaking function and to seek their assistance.

In fact, calling for police assistance was entirely reasonable given Baier's perception of exigent circumstances. Indeed, as suggested during oral argument, under these circumstances, had Baier not called the police and matters took a turn for the worse, he might well have faced a § 1983 claim. See, e.g., Henderson v. City of Phila., No. 98-3861, 1999 WL 482305, at *4 (E.D. Pa. July 12, 1999) (plaintiff filed § 1983 claim alleging state-created danger where police officers, present to oversee decedent's involuntary commitment, did not take him into custody and control his movements before he jumped out window, killing himself). Accordingly, the Court finds that a reasonable probation officer in Baier's situation could have perceived circumstances warranting police assistance. On the date in question, it was not clearly established that relying on the police's authority to conduct a well-being check under the above-mentioned circumstances was unlawful. See Ray, 626 F.3d at 177.[27]

As to Winik and Baran, the evidence of record supports that they, too, acted reasonably under the circumstances. Upon Winik's arrival, Baier told her that he had talked to Pagano,

---

[27]     Notably, Plaintiff points to no evidence to support a "pretext" situation.

who was slurring his words and had said, "I'm having a real problem here. I'm having a problem here," and was no longer responding. Winik Dep. 38:1-7, 40:19-41:2. Winik subsequently relayed this information to Baran. Neither Winik nor Baran had reason to doubt that the circumstances were as Baier had relayed them.[28] Moreover, and as in Ray, upon knocking on his apartment door and calling out to Pagano, the officers received no response, reasonably heightening their concern. Under these circumstances, it would not have been clear to a reasonable officer that conducting a well-being check was unlawful. See Ray, 626 F.3d at 177.

Plaintiff's alternative argument that, in failing to treat Pagano as a barricaded individual, the officers violated Bristol Township Police Department policy and thus acted objectively unreasonably likewise fails.[29] The doctrine of

---

[28]    Whether this information was, in fact, true or correctly relayed to the officers is immaterial; instead, the correct inquiry is whether the police officers—based on the information they had at the time—acted reasonably, from the perspective of an objectively reasonable officer under the circumstances. See Ray, 626 F.3d at 174.

[29]    Moreover, abandonment of police department protocol, alone, cannot form the basis for seeking a remedy under § 1983 or deprive officials of qualified immunity. See Collins v. City of Harker Heights, 503 U.S. 115, 119 (1992) (holding that § 1983 does not provide remedy if there is no violation of federal law); Davis v. Scherer, 468 U.S. 183, 194 (1984) (stating that officials do not lose qualified immunity where they violate administrative directives).

qualified immunity shields officers in the ordinary and reasonable exercise of their discretionary duties.

Here, General Order E-02 called for the officers to exercise their discretion in determining whether a barricaded individual situation exists.  That, at the outset, Winik and Baran did not perceive Pagano to be a barricaded person was not unreasonable:  he did not tell the officers to stay out or threaten to harm himself, or another; in fact, he did not respond to the officers at all.  The officers' judgment is consistent with the guidance in the International Association of Chiefs' of Police Training Keys on barricaded persons, which provides training scenarios identifying factors to be considered when declaring a barricaded individual scenario.[30]  Indeed, the only fact suggesting that Pagano wished to be left alone was the furniture pushed against the door, which the officers only discovered after entering Pagano's apartment.  Once inside, the officers also observed the syringes and state of disarray, coupled with the fact that Pagano was not responding to the announcement of their entry into the apartment.  Under these

---

[30]      See Ryan Report 26 & n.8 (referencing International Association of Chiefs' of Police Training keys on barricaded subject, which includes as training scenario well-being check on person reported to be suicidal, and noting lack of consensus regarding criteria, as majority of situations "are less clear cut, and involve complicated and confusing circumstances that cause the decision-making process to be extremely challenging"); see also Pl.'s Resp. Mem.—Officer Defs. 69-78 (quoting various officers' depositions).

circumstances, in declining to treat Pagano as a barricaded individual but rather as an individual experiencing a medical emergency, the officers did not violate clearly established law of which a reasonable officer would have known.

Regrettably, that the events inside the apartment later unfolded as they did does not render the officers' initial decision unreasonable. The Third Circuit has expressly disapproved of trial courts judging officers' conduct depending on the outcome of their decisions. Indeed, the parties recognize that the Court must review each officer's actions from the perspective of an objectively reasonable officer under the circumstances, and must avoid hindsight. See Graham, 490 U.S. at 396; Ray, 626 F.3d at 174. Accordingly, the Court finds that, as their conduct did not violate clearly established constitutional or statutory law, Winik, Baran, and Baier are entitled to qualified immunity for their warrantless entry into Pagano's apartment.

### 2. Baran's Use of Pepper Spray

The Court will now address whether Baran is entitled to qualified immunity for his use of pepper spray. The Court finds that Baran is entitled to qualified immunity.[31]

---

[31] The Court reiterates that, for the purposes of qualified immunity analysis, the Court will assume, without

Plaintiff argues that because Baran failed to use less intrusive verbal commands first, his use of pepper spray violated department policy and was thus against the law.[32]  Pl.'s Resp. Mem.—Officer Defs. 23.  Moreover, Plaintiff concludes that, once they found Pagano "passively sitting in the closet," any safety or well-being concern justifying their continued presence was at that point objectively unreasonable.  Id. at 39.[33]

---

deciding, that Baran's conduct violated Pagano's Fourth Amendment rights.

[32]    Plaintiff does not appear to argue that the Bristol Township policy permitting the use of pepper spray, itself, violates the Fourth Amendment; instead, Plaintiff challenges the reasonableness of Baran's belief that this policy permitted pepper spray on the date in question.  Therefore, the Court will address the reasonableness of Baran's belief that his conduct fell within department guidelines.  See Kornegay v. Cottingham, 120 F.3d 392, 395-96 (3d Cir. 1997) ("Qualified immunity turns on the reasonableness of the officers' belief that their conduct was legal not its legality per se.  To determine reasonableness, a reviewing court must ask whether a reasonable person could have believed the defendant's actions to be lawful in light of clearly established law and the information he possessed." (internal quotation marks and citations omitted)); see also Couden v. Duffy, 446 F.3d 483, 505-06 (3d Cir. 2006) (holding that use of pepper spray does not per se violate individual's constitutional rights).

[33]    In support, Plaintiff cites the expert opinion of Dr. R. Paul McCauley.  McCauley Report 13-14 (opining that "the entry and sweep of this barricaded apartment to locate Mr. Pagano was not reasonable. . . . [I]n my opinion . . . this well-being check became a barricaded person situation, and the officers were required to have a supervisor as directed by Bristol Township Police Department General Order E-02.").

Baran points to Bristol Township General Order B-09, which authorizes use of pepper spray, among other circumstances, when it is unsafe for an officer to approach a suspect within contact range. Baran argues that, because he could not see Pagano's hands as he crouched in the closet, and after Pagano did not respond to several orders to come out of the closet or to show his hands, Baran believed approaching him would have been unsafe.[34] Officer Defs.' Reply 4, 9.

First, the Court finds that, based on the circumstances he encountered once inside Pagano's apartment, a reasonable officer in Baran's circumstances could have perceived a heightened emergency situation. The Court highlights that, upon entering Pagano's apartment and seeing the state of disarray and the syringes, together with Pagano's failure to respond, the officers had no additional information regarding the nature of the perceived emergency or of Pagano's status.

_____

[34] In support, Officer Baran cites the expert opinion of John Ryan. Ryan Report 18 (opining that Officer Baran's decision to use pepper spray to gain Pagano's compliance was consistent with generally accepted practice and specific policies regarding pepper spray). Mr. Ryan also notes that [i]t is well known in law enforcement that the inability of an officer to see a subject's hands dramatically increases the threat to the officer and anyone else present." Id. at 20. Indeed, officers are taught that the failure to watch a subject's hands is one of "ten deadly errors." Id. at 20-21. The Court credits this opinion insofar as it supports the reasonableness of Officer Baran's belief that his inability to see Pagano's hands posed a safety threat requiring further action.

Once they discovered him in the closet, the officers stated that Pagano was hidden behind a tote, his hands were not visible, and he was still not responding—which Plaintiff does not contest. At this point, a reasonable officer in Baran's circumstances could have perceived a danger to himself and the other officers.

And second, the Court finds that an officer in Baran's circumstances reasonably could have believed that his conduct comported with Bristol Township Police Department policy and would not have violated Pagano's constitutional rights.[35] General Order B-09 authorizes the use of pepper spray as a less-than-lethal force option, and it is specifically approved in a number of scenarios, including where officers are confronted with resistant individuals or when it is unsafe for an officer to approach a suspect within contact range. The policy instructs officers to use verbal commands prior to utilizing pepper spray whenever "practicable and reasonable." Even accepting Plaintiff's version of the encounter, wherein Baran did not specifically order Pagano to show his hands, under the circumstances—namely, his perceived concern for officer safety—an officer in Baran's position reasonably could have believed that using verbal commands would have been futile, and that the

---

[35] As Officer Defendants point out, the use of pepper spray is not per se unlawful. Officer Defs.' Reply 7 (citing Couden, 446 F.3d at 505-06).

use of pepper spray, as a lesser force option, was authorized. Accordingly, using pepper spray under these circumstances did not violate clearly established constitutional or statutory law, and so the Court finds that Baran is entitled to qualified immunity on this issue.

### 3. Winik's Use of Deadly Force

The Court will now address whether Winik is entitled to qualified immunity for her use of deadly force. Here too, the Court finds that qualified immunity applies.[36]

Like Baran's use of force, as to Winik the question before the Court is whether a reasonable officer in her position could have believed that deadly force was authorized; namely, was it clearly established that using deadly force under these circumstances was unlawful. As a guide post, the Court first looks generally to the Third Circuit's reasoning in evaluating the use of deadly force when effectuating an arrest, which instructs district courts—and police officers—as follows:

> Giving due regard to the pressures faced by the police, was it objectively reasonable for the officer to believe, in light of the totality of circumstances, that deadly force was necessary to prevent the suspect's escape, and that the suspect posed a significant threat of death or serious

---

[36] As above, the Court presumes that Winik's conduct violated Pagano's Fourth Amendment rights. Indeed, the shooting clearly constituted a "seizure." Garner, 471 U.S. at 7; Curley, 499 F.3d at 203 n.4.

> physical injury to the officer or others? In
> determining the reasonableness of all degrees of
> force, the Supreme Court has said that the factors to
> consider include the "severity of the crime at issue,
> whether the suspect poses an immediate threat to the
> safety of the officer or others, and whether he is
> actively resisting arrest or attempting to evade
> arrest by flight."

Abraham v. Raso, 183 F.3d 279, 289 (3d Cir. 1999) (quoting

Graham, 490 U.S. at 396) (reversing district court's summary

judgment disposition of excessive force claim, finding genuine

issues of material fact based on inconsistencies in officer's

testimony and forensic evidence, and thus finding issue of

credibility for fact-finder to determine at trial). Where, as

here, the proffered justification is self-defense or the defense

of other officers, the threshold inquiry is likewise whether it

was "objectively reasonable for an officer in [Winik's]

position" to believe she was in danger, "giving due regard to

the pressures of the moment." See Raso, 183 F.3d at 293. When

assessing the reasonableness of an officer's use of deadly

force, courts have considered, among other factors, "whether the

suspect poses an immediate threat to the safety of the officers

or others, . . . the duration of the officer's action, . . .

[and] the possibility that the suspect may be armed." Couden,

466 F.3d at 496-97 (internal quotation marks and citations

omitted); see also Bennett v. Murphy, 274 F.3d 133, 136-37 (3d

Cir. 2002) (noting that use of deadly force contravenes Fourth

Amendment's reasonableness standard where individual does not pose immediate threat to safety of officer or others).

The Court finds that an officer in Winik's circumstances reasonably could have believed that the use of deadly force was necessary. Even accepting Plaintiff's version of the events—namely, that Pagano was shot closer to where he fell—this minimal difference in distance, which, according to the forensic evidence and the Scene Diagram, could only have been a matter of a few feet, would not undermine the objective reasonableness of Winik's actions.

The evidence of record establishes that Pagano was armed with an edged weapon,[37] that Winik discharged her firearm from the opposite end of the hallway and hit Pagano in the mid to lower right side, and that the hallway in Pagano's apartment was only eleven feet long. Given the layout of the apartment, even assuming Pagano was still inside the bedroom, a reasonable officer in Winik's position could have perceived that Pagano was closer than twenty-one feet and posed a danger to her and the

---

[37] Significantly, given that Pagano's conduct—namely, arming himself with a shard of glass—constitutes a superseding cause, any alleged unlawfulness of the officers' initial entry into Pagano's apartment would not impact the reasonableness of Winik's later use of deadly force. See, e.g., Lamont, 637 F.3d at 186 (observing that "as long as the officer's use of force was reasonable given the plaintiff's acts, then despite the illegal entry, the plaintiff's own conduct would be a superseding cause that limited the officer's liability" (internal quotation marks and citations omitted)).

other officers.  Scene Diagram.  As Plaintiff's counsel

observed, "[a]t that moment [Officer Winik was] protecting

herself and her fellow officer and Probation Officer Baier, she

may have perceived that she actually was, and that's not going

to be able . . . to be disputed."  Hr'g Tr. 56:1-4.[38]

Pagano's death, while tragic, did not result from

unreasonable action by the police.  Indeed, based on her

training and the circumstances before her—namely, an officer, at

approximately five-four and one hundred and five pounds and

faced with an approximately six-feet tall suspect armed with an

edged weapon, operating in narrow quarters and in a fast-

developing and unpredictable situation—a reasonable officer in

Winik's situation could have perceived an imminent threat to her

safety and that of her fellow officers.  Under these

circumstances, Winik's use of deadly force did not violate

clearly established constitutional or statutory law.

Accordingly, Winik is entitled to qualified immunity.

Having found that qualified immunity protects the

officers' warrantless entry into Pagano's apartment, Baran's use

of pepper spray, and Winik's use of deadly force, the Court will

---

[38]      Although disagreeing with the officers' conduct
overall, Plaintiff's expert also acknowledges that at this
point, "[a]ssuming Mr. Pagano was within 12-15 feet of PO Winik,
advancing toward her, holding an edged weapon . . . in a raised
or threatening manner, PO Winik's use of deadly force at the
moment she fired a round at Mr. Pagano was justified."  McCauley
Report 24.

grant Defendants' motions for summary judgment on all Fourth
Amendment-based § 1983 claims against the individual officers.

B. Remaining Eighth and Fourteenth Amendment Claims

Having resolved Plaintiff's Fourth Amendment claims,
the Court will now address Plaintiff's remaining Eighth and
Fourteenth Amendment claims, alleging the denial of medical
care, a state created danger, and a violation of Pagano's
substantive due process rights.

1. Denial of Medical Care Claim

First, the Court will summarily address Plaintiff's
Eighth[39] and Fourteenth Amendment[40] claims alleging the denial of

---

[39]     Plaintiff's Eight Amendment basis for the alleged
delay of medical treatment claim must fail.  "While the Eighth
Amendment prohibits the infliction of cruel and unusual
punishment upon prisoners, it applies only after the State has
secured a formal adjudication of guilt in accordance with due
process of law." Natale v. Camden Cnty. Corr. Facility, 318
F.3d 575, 581 (3d Cir. 2003) (internal citations and quotation
marks omitted).  Thus, Plaintiff's Eighth Amendment claims will
be analyzed under the Due Process Clause of the Fourteenth
Amendment.  See id.

[40]     The Court will also grant summary judgment on
Plaintiff's due process-based denial of medical care claim.  To
state a claim for pre-incarceration deprivation of medical care,
Plaintiff must demonstrate an objective and sufficiently serious
need for medical care, and that subjectively, the officers were
deliberately indifferent to that need.  Groman v. Twp. of
Malapan, 47 F.3d 628, 637 (3d Cir. 1995).  Inadvertence or
negligence is insufficient; rather, deliberate indifference
occurs only where an officer subjectively "knows of, and
disregards an excessive risk to inmate health or safety."
Farmer v. Brennan, 511 U.S. 825, 837 (1994).

medical care.  Plaintiff has not demonstrated a genuine dispute

of material fact on either of these claims; thus the Court will

grant summary judgment as to both claims.

   2. State Created Danger and Generalized Substantive Due
      Process Claims

   The Court will now address Plaintiff's collective-

liability theories:  a state-created danger claim; and a

generalized substantive due process claim.[41]  Plaintiff fails to

---

   In their motion for summary judgment, Officer
Defendants point to the 911 Call Log, showing that Baran called
for an ambulance within minutes of shots having been fired.
Officer Defs.' Mem. 28 (citing Recording of Bucks County Radio
Transmissions 6:25).  The only other conduct arguably related to
this claim includes Evans' initial use of handcuffs to secure
Pagano after he was shot.  The handcuffs, used to secure the
scene for emergency medical personnel, were only on for one to
two minutes before Evans removed them and rendered medical
assistance until the ambulance arrived.  Id. at 16 (citing Evans
Dep. 11:20-22; McAndrews Dep. 66:6-22).  Moreover, Plaintiff has
conceded that Evans is entitled to summary judgment on all
claims.  See supra n.1.

   In responding to Officer Defendants' motion, Plaintiff
appears to abandon this claim, in that Plaintiff offers neither
facts nor even argument to contradict the Officer Defendants'
evidence.  Thus, Plaintiff's deprivation of medical care claim
cannot survive summary judgment.  See, e.g., Seals v. City of
Lancaster, 553 F. Supp. 2d 427, 432-33 (E.D. Pa. 2008).

[41]    To the extent that Plaintiff alternatively advances a
civil conspiracy theory, such a claim is easily dismissed.
Plaintiff fails to point to evidence of record suggesting a
conspiracy to harm Pagano among Winik, Baran, and Baier.  See
Melo v. Haver, 912 F.2d 628, 638 (3d Cir. 1990).  Indeed, Winik
stated that, prior to the incident in question, she had never
met Baier.  Plaintiff points to no evidence of record to suggest
otherwise, or to suggest that Baier knew Baran or Evans.

demonstrate a genuine dispute of material fact to warrant proceeding with either claim.

The parties agree that, to successfully plead the state-created danger claim, Plaintiff must demonstrate: (1) the harm ultimately caused was foreseeable and a fairly direct result of Defendants' actions; (2) Defendants acted with willful disregard or deliberate indifference to Pagano's safety; (3) a relationship existed between the state and Pagano; and (4) Defendants used their authority to create an opportunity for harm that otherwise would not have existed. See Estate of Smith, 430 F.3d at 153 ("[T]he second element of this test is only satisfied by conduct that 'shocks the conscience.' Although this requirement is but one element of the test, it is often the most difficult for a plaintiff to show, and thus our ultimate conclusion frequently turns on our determination of

---

Moreover, Plaintiff offers no evidence demonstrating a "meeting of the minds" to violate Pagano's rights among Baier and the police officers, as each arrived on the scene. Plaintiff argues that Baier was an "overzealous probation officer who was determined to enter the apartment no matter what." Even assuming, arguendo, that this was true, and that the officers' warrantless entry, Baran's use of pepper spray, and Winik's use of deadly force constituted actionable constitutional violations, Plaintiff points to no evidence of record demonstrating an agreement or mutual understanding between the officers. Thus, to the extent advanced, a civil conspiracy theory cannot survive summary judgment.

whether given conduct 'shocks the conscience.'"); <u>Kneipp v.</u>

<u>Tedder</u>, 95 F.3d 1199, 1205 (3d Cir. 1996).

Under the second element of the state-created danger

claim and at the heart of the generalized substantive due

process claim under the Fourteenth Amendment, to survive summary

judgment Plaintiff must point to evidence of record suggesting

that the officers' conduct was so outrageous as to "shock the

conscience." <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. 833, 846-47

(1998).[42]  Only the most egregious official conduct will be found

---

[42]      In <u>Lewis</u>, the police had engaged in a high-speed
chase—reaching 100 miles per hour—of a motorcyclist carrying a
passenger, ultimately resulting in the motorcycle tipping over,
the passenger falling off, and the police car crashing into and
killing the passenger.  The Supreme Court found that this
conduct failed to rise to the conscience-shocking level,
reasoning that only "a purpose to cause harm unrelated to the
legitimate object of arrest will satisfy the element of
arbitrary conduct shocking to the conscience, necessary for a
due process violation." <u>Id.</u> at 836; <u>c.f.</u> <u>Rochin v. California</u>,
342 U.S. 165, 172-73 (1952) (finding that force-pumping
suspect's stomach "shocks the conscience").

       In reaching its decision, the <u>Lewis</u> Court contrasted
the police officers' conduct with that of prison officials
facing liability under the Eighth Amendment for their deliberate
indifference to the medical needs of prisoners. 523 U.S. at 851.
The Court reasoned that "in the custodial situation of a prison,
forethought about an inmate's welfare is not only feasible but
obligatory under a regime that incapacitates a prisoner to
exercise ordinary responsibility for his own welfare." <u>Id.</u>  The
Court held that the "[r]ules of due process are not . . .
subject to mechanical application in unfamiliar territory.
Deliberate indifference that shocks in one environment may not
be so patently egregious in another. . ." <u>Id.</u> at 850.

       In applying the "deliberate indifference" test, the
Third Circuit has looked to the definition of "deliberate

to shock the conscience.  United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392, 399 (3d Cir. 2003). Whether an executive action is conscience shocking depends on the context in which it takes place.  Schieber v. City of Phila., 320 F.3d 409, 417 (3d Cir. 2003).  Thus, conduct that is conscience-shocking in one set of circumstances might fail to shock the conscience in another.  See id. ("In particular, the degree of culpability required to meet the 'shock the conscience' standard depends upon the particular circumstances that confront those acting on the state's behalf.").

Recently, the Court rehearsed the Third Circuit's jurisprudence regarding the "shock the conscience" standard.

> The Third Circuit has identified three standards that
> can support a finding that government action shocks
> the conscience: (1) deliberate indifference; (2) gross
> negligence or arbitrariness; or (3) intent to cause
> harm.  Phillips v. Cnty. of Allegheny, 515 F.3d 224,
> 241 (3d Cir. 2008) (citing Sanford v. Stiles, 456 F.3d

---

indifference" employed in Eighth Amendment jurisprudence—that is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Nicini v. Morra, 212 F.3d 798, 811 (3d Cir. 2000) (quoting Farmer, 511 U.S. at 837).  The Third Circuit, however, has not yet decided whether an objective or subjective standard of liability should apply in substantive due process cases.  Id. ("This case does not require us to determine whether an official's failure to act in light of a risk of which the official should have known, as opposed to failure to act in light of an actually known risk, constitutes deliberately indifferent conduct in this setting.").  The Court need not reach a determination on this issue in the instant action, as the officers were neither objectively, nor subjectively deliberately indifferent.

298, 306 (3d Cir. 2006)).[43]   In hyper-pressurized
environments calling for a state actor's instant
judgment, such as a high-speed police chase, intent to
harm must be found to give rise to liability under the
Fourteenth Amendment. Lewis, 523 U.S. at 854.  Where
state actors must act quickly, but have some time to
deliberate—for instance, a social worker acting to
separate a parent and child—"the standard of
culpability for substantive due process purposes must
exceed both negligence and deliberate indifference,
and reach a level of gross negligence or
arbitrariness." Miller v. City of Phila., 174 F.3d
368, 375-76 (3d Cir. 1999). Finally, where state
actors have "the luxury of proceeding in a deliberate
fashion . . . deliberate indifference may be
sufficient to shock the conscience." Estate of Smith
v. Marasco, 430 F.3d 140, 153 (3d Cir. 2005); see also
Kaucher v. Cnty. of Bucks, 455 F.3d 418, 426 (3d Cir.
2006) (failing to find deliberate indifference of
correctional facility with respect to spread of
infection among inmates and officers); A.M. ex rel
J.M.K. v. Luzerne Cnty. Juvenile Detention Center, 372
F.3d 572 (3d Cir. 2004) (applying deliberate
indifference standard with respect to juvenile
detainee's welfare); Leamer v. Fauver, 288 F.3d 532
(3d Cir. 2002) (applying deliberate indifference
standard with respect to prison inmates' welfare);
Nicini v. Morra, 212 F.3d 798, 810 (3d Cir. 2000)
(applying deliberate indifference standard with
respect to care for foster child).[44]

---

[43]     Though Phillips and Sanford are both cases involving
state-created danger, the analysis regarding what shocks the
conscience is derived from general substantive due process
cases, not involving state-created danger. See Sanford, 456
F.3d at 306 (discussing Lewis and Miller v. City of Phila., 174
F.3d 368, 375 (3d Cir. 1999), cases not involving state-created
danger).  The analysis of Phillips and Sanford has therefore
been applied by district courts in general substantive due
process cases. See, e.g., MFS Inc. v. DiLazaro, 771 F. Supp. 2d
382, 439 (E.D. Pa. 2011) (applying three standards delineated in
Phillips).

[44]     Notably, the Third Circuit has only applied the
"deliberate indifference" standard in the context of injury to
wards of the state.

<u>Customers Bank, et al. v. Mun. of Norristown, et al.</u>, No. 12-2471, 2013 WL 1789772, at *5 (E.D. Pa. Apr. 26, 2013) (Robreno, J.).

Here, Plaintiff argues that—at every stage—Winik and Baran escalated, rather than de-escalated the situation. As to Baier, specifically, Plaintiff argues that he "put the wheels in motion," unreasonably escalating the situation that ultimately lead to Pagano's death. Pl.'s Resp. Mem.—Def. Baier 46-47. Accordingly, even though he did not pull the trigger, Plaintiff argues that Baier is also liable for Pagano's death.

To the extent that Plaintiff seeks to aggregate Defendants' actions as a means of showing that, collectively, their conduct shocks the conscience, such an attempt fails. The "shock the conscience" standard is intentionally narrow, and Plaintiff's claims as to each Defendant must stand or fall based on the conduct of each Defendant individually. <u>See</u> <u>Estate of Smith</u>, 430 F.3d at 151. Under § 1983, there is no respondeat superior or vicarious liability. <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 691-92 (1978); <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989).

As to Winik and Baran, in light of the safety concerns present once the police officers encountered Pagano crouched in the closet, the record shows that they made an effort to

communicate without harming him, beginning with verbal orders, and followed by non-lethal force. Once Pagano armed himself with the shard of glass, the police officers first retreated and then issued several orders to stop and drop the glass before Winik discharged her weapon. The Court recognizes that, at various points during the incident in question, the responding officers had more, and sometimes less, time to deliberate regarding their response. But by any measure—whether it be deliberate indifference, gross negligence or arbitrariness, or intent to cause harm—the police officers' conduct does not suggest a conscience-shocking disregard for Pagano's safety. To the contrary, the evidence suggests that the officers were concerned for Pagano's well-being.

Likewise, the record suggests that Baier also acted out of concern for Pagano's well-being. As noted above, during oral argument, counsel for Plaintiff acknowledged that Baier only had limited contact with Pagano and did not harbor any ill will toward him. Hr'g Tr. 36:4-12; 48:4-22. Plaintiff fails to point to evidence of record from which a jury could conclude that Baier intentionally fabricated the communication with Pagano and then, knowing the nature and extent of Pagano's difficulties, deliberately misled the police.[45]

---

[45] Plaintiff additionally concludes that "when Baier entered Pagano's apartment and disregarded the barricade, he was

Nor can it be suggested that, in calling the police for assistance, Baier acted with deliberate indifference, gross negligence or arbitrariness, or intent to cause Pagano harm.[46] Instead, the evidence of record points to the opposite; upon knocking on the door and receiving no response from Pagano, Baier called the police for assistance to check on Pagano's well-being. On these facts, Plaintiff fails to demonstrate

---

doing the very same thing as if he had placed Pagano in the path of a bullet that ultimately killed him." Pl.'s Resp. Mem.-Def. Baier 42. But plaintiff's argument cuts both ways. First, as noted above, Plaintiff points to no evidence suggesting that Baier knew the extent of Pagano's ongoing drug and mental health issues on the date in question. And second, assuming that Baier was aware of these issues, absent verbal communication from Pagano instructing him to stay out, Baier likewise reasonably could have perceived a drug or mental health-related medical emergency requiring immediate attention. Under either assumption, Plaintiff nevertheless cannot prove that Pagano's death would have been a reasonably foreseeable result of Baier's actions, as also required to prevail on a state-created danger claim.

[46] C.f. Rivas, 365 at 181 (denying qualified immunity on state-created danger claim where plaintiff presented evidence that paramedics falsely told police that victim had attacked them and then further failed to communicate to police that victim had suffered seizure and therefore should not be restrained, which the police subsequently did, ultimately causing victim's death). Under different facts, Rivas might offer some support. However, as discussed above, Plaintiff fails to point to facts supporting either the deliberate indifference or foreseeability prongs. Unlike the EMTs in Rivas, who personally witnessed the resident-victim suffering from one or more seizures, here, Plaintiff offers no facts suggesting that Baier knew the nature of Pagano's distress on the date in question yet deliberately mislead the police. At best, even if Baier was aware of Pagano's drug and mental health issues, Plaintiff fails to point to facts suggesting that by seeking police assistance, Baier acted unreasonably.

conscience-shocking behavior, or that Baier's actions amounted

to a state-created danger.[47]

---

[47]     Notably, traditional state-created danger theory of
liability cases—arising where a state actor <u>fails</u> to act,
thereby leaving an otherwise vulnerable person to suffer
consequences ultimately caused by an independent source of harm—
offer Plaintiff little factual support.  <u>See</u> <u>Kniepp</u>, 95 F.3d at
1199; <u>see also, e.g.</u>, <u>Kaucher</u>, 455 F.3d at 418; <u>Morse v. Lower
Merion Sch. Dist.</u>, 132 F.3d 902 (3d Cir. 1997) (finding that
state's action was not "but for cause" of plaintiff's harm where
teacher killed in daycare center, leased from school district,
after mentally ill attacker entered door left unlocked by
center's operator).

        In <u>Morse v. Lower Merion School District</u>, the Third
Circuit recognized, alternatively, that a state-created danger
theory could proceed where, instead of particularized knowledge
of vulnerability, a plaintiff belongs to an "identifiable and
discrete class of persons subject to the harm the state
allegedly has created."  132 F.3d at 914 (citing <u>Reed v.
Gardner</u>, 986 F.2d 1122 (7th Cir. 1993) (recognizing state-
created danger claim on definable class of persons theory, where
police arrested driver but left behind intoxicated passenger
with keys to vehicle and passenger subsequently drove and
collided with plaintiffs' vehicle, killing or injuring
occupants)).  However, Plaintiff fails to point to evidence
suggesting that Baier knew Pagano belonged to any such
identifiable discrete class, thereby rendering Probation Officer
Baier's conduct "deliberately indifferent" to "foreseeable"
harm.

        Nor does Plaintiff find support among cases in which
the state actor allegedly created the source of harm by an
affirmative act.  <u>C.f.</u> <u>Sciotto v. Marple Newtown Sch. Dist.</u>, 81
F. Supp. 2d 559 (E.D. Pa. 1999) (denying summary judgment as to
state-created danger theory of liability against school
district, where wrestling coach invited alumnus—a twenty-two-
year-old college wrestler, weighing approximately 150 pounds—to
assist in practice, who wrestled with and injured a sixteen-
year-old high school wrestler, weighing approximately 110
pounds, and in addition to inherent dangerousness of tradition,
prior injury had occurred under similar circumstances, rendering
sixteen-year-old's injury arguably "foreseeable").  Here,
Plaintiff points to no facts suggesting either the inherent

Once inside Pagano's apartment, Plaintiff fails to point to evidence of record demonstrating that Baier was <u>directly</u> involved—either personally or in a supervisory capacity—in any of the alleged federal constitutional violations under the Fourth, Eighth, or Fourteenth Amendment as required to plead liability under § 1983. <u>See, e.g.</u>, <u>Lamont</u>, 637 F.3d at 186 ("Like a tort plaintiff, a § 1983 plaintiff must establish both causation in fact and proximate causation. A superseding cause breaks the chain of proximate causation." (internal citations omitted)). As the record indicates, upon their arrival, Winik assumed control of the scene and directed entry into Pagano's apartment. Beginning with Winik's decision to enter Pagano's apartment, Plaintiff fails to demonstrate that Baier, while following the officers into the apartment and assisting them in urging Pagano to communicate with the police, had any direct involvement in the police officers' use of force—much less control over the ensuing events—for the purpose of demonstrating § 1983 liability.

For all of the reasons stated above, the Court finds that the actions of Winik, Baran, and Baier fail to "shock the

---

dangerousness of a well-being check or that Defendants were on notice of any particular circumstances rendering Pagano's conduct, and ultimately death, foreseeable.

conscience."  Thus, the Court will grant Defendants' motions for summary judgment as to Counts I and II.

## V.    __MONELL__ AND FAILURE-TO-TRAIN CLAIMS

Next, the Court will address Plaintiff's Monell and failure-to-train claims against Bristol Township and McAndrews. In sum, Plaintiff alleges that Bristol Township and the Bristol Township Police Department failed to implement and adequately train the officers regarding a barricaded individual situation. Pl.'s Resp. Mem.—Officer Defs. 66.  Plaintiff's claims cannot survive summary judgment.

Municipalities and other government entities are subject to suit under § 1983 for constitutional rights violations.  Monell, 436 U.S. at 690-92.  Commonly known as a "Monell" claim, liability is imposed only when the government, "under color of some official policy, 'causes' an employee to violate another's constitutional rights."  Id.  Liability will not be imposed on a respondeat superior theory.  Id. at 692.  To plead a Monell claim, a plaintiff must show that:  (1) the municipality had a policy or custom that deprived Pagano of his constitutional rights; (2) the municipality acted deliberately and was the moving force behind the deprivation; and (3) that Pagano's injury was caused by the identified policy or custom.

Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403-04 (1997) (citation omitted).

Similarly, to plead a failure-to-train claim, a plaintiff must show that "a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality." City of Canton, 498 U.S. at 389. A court must assess "the adequacy of the training program in relation to the tasks the employees must perform." Id. at 389-90. Mere allegations that the municipality could have or should have incorporated different training programs are insufficient; so too are mere allegations that "a particular officer may be unsatisfactorily trained." Id. at 389-91. Rather, "deliberate indifference" requires facts showing "a deliberate choice to follow a course of action [that] is made from among various alternatives" without regard to the known or obvious consequences. Id. at 389; Berg v. Cnty. of Allegheny, 217 F.3d 261, 276 (3d Cir. 2000). "When city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." Connick v. Thompson, 131 S. Ct. 1350, 1361 (2011). The Supreme Court has stated that "[a] municipality's culpability for a deprivation of rights is at its

most tenuous where a claim turns on a failure to train." Id. at 1359.

Plaintiff's sole theory for both claims appears to be that Bristol Township and the Bristol Township Police Department were deliberately indifferent to the alleged constitutional violations resulting from their failure to implement an adequate policy regarding barricaded individuals, and consequentially their failure to train on such a policy. Pl.'s Resp. Mem.— Officer Defs. 65. Plaintiff argues that this claim should withstand summary judgment because she has produced facts tending to show that the consequences of Bristol Township's and Bristol Township Police Department's actions were so obvious that their conduct "can only be characterized as deliberate indifference." Id. (citing Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990)).

The record suggests otherwise. First, as to Plaintiff's Monell claim, it is undisputed that, on the date in question, the Department had an official policy regarding barricaded individuals—General Order E-02. That policy did not define "barricaded individual"; rather, the policy left such a determination to the discretion of the responding officers. As discussed above, declining to apply the barricaded individual policy to this situation was not unreasonable. Pagano did not tell the officers to stay out; in fact, he did not respond at

all.  Other than the positioning of the couch against the door and the status of his apartment, which the officers only observed once they were inside, Pagano had not communicated in any way that he would resist the officers if they came into his apartment.  Rather, the officers were operating under the belief that a medical emergency was in progress.

But even assuming that the police officers should have treated Pagano as a barricaded individual, Plaintiff fails to demonstrate that, as drafted, General Order E-02 was so deficient as to render the policy-makers deliberately indifferent to its application.[48]  Indeed, that General Order E-02 vested discretionary authority in the officers was not a policy-determination solely of Bristol Township's own making; in fact, the need for officers to exercise discretionary judgment based on the circumstances is recognized on a national policy-making level.  See Officer Defs.' Reply 14 (citing Ryan Report 26 n.8 (noting that International Association of Chiefs of

---

[48]      Plaintiff attempts to compare this case to the facts in Pelzer v. City of Phila., No. 07-0038, 656 F. Supp. 2d 517 (E.D. Pa. 2009) (Stengel, J.) (holding that plaintiff stated deliberate indifference claim sufficient to withstand summary judgment where police department failed to implement policies as recommended in Integrity and Accountability Office report, which raised serious questions regarding lack of training on practice at issue).  But the situations are not analogous.  Unlike in Pelzer, here, Plaintiff does not point to any report raising questions about or recommending a policy change; thus, the department could not have acted with deliberate indifference to such a recommendation.

Police Training Keys raises more questions than answers regarding what constitutes barricaded person)).

And second, as to Plaintiff's failure-to-train claim, it is undisputed that the officers received training materials regarding General Order E-02. Plaintiff argues, however, that Bristol Township and the Bristol Township Police Department should have incorporated additional training regarding a barricaded-individual scenario, and that Winik was insufficiently trained. But in concluding that General Order E-02 is deficient because it does not define "barricaded individual," Plaintiff fails to point to what additional training the officers should have been provided to guide the exercise of discretion when confronted with a potential barricaded individual scenario, and—most importantly—how that additional training would have altered the officers' actions in this case.[49] Thus the Court will grant Defendants' motions regarding Plaintiff's <u>Monell</u> and failure-to-train claims.

_____

[49] Notably, the circumstances here did not meet several criteria typical of a barricaded-person scenario. For example, Pagano did not refuse orders to exit but instead remained non-responsive; similarly, rather than verbally indicating that the Police should stay out, Pagano remained silent; and Pagano did not make verbal threats of harm to himself or others as the officers attempted to enter. Ryan Report 17 & n.2.

Moreover, Winik later received specialized training focusing on mentally ill subjects, but testified in her deposition that nothing she learned in that training would have

## VI.  CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motions as to Counts I to IV.  And, having dismissed all federal claims, the Court will decline to exercise supplemental jurisdiction over the remaining state-law claims, in Counts V to VII.[50]  An appropriate order will follow.

_____

changed her actions on the date in question.  Officer Defs.' Reply 15.

[50]      It appears that privilege under Pennsylvania law would likely defeat Plaintiff's remaining state-law claims. Nevertheless, as the basis for this Court's jurisdiction has been dismissed, in the interest of comity the Court will exercise its discretion and dismiss Plaintiff's remaining state-law claims without prejudice so that, if Plaintiff wishes, she may obtain a ruling on these claims from a Pennsylvania Court. See 28 U.S.C. § 1367(c)(3) (2012); Figueroa v. Buccaneer Hotel Inc., 188 F.3d 172, 181 (3d Cir. 1999) (affirming that district court may decline to exercise supplemental jurisdiction once it has dismissed claims over which it had original jurisdiction).